CHICAGO, R. I. & G. RY. CO. v. WENTZEL et ux. (No. 9112.)

(Court of Civil Appeals of Texas. Ft. Worth. May 31, 1919.)

1. RAILROADS ⊕⇒338 — DISCOVERED PERIL—CROSSING ACCIDENT — DUTY OF FLAGMAN ON TRAIN.

A flagman on a train backing towards crossing, who sees the imminence of the danger of collision with an approaching automobile, and realizes that the automobile will not stop before reaching track, must exercise ordinary care to use every reasonable means in his power to prevent collision by stopping the train.

2. RAILROADS ⊕⇒351(7)—CROSSING ACCIDENT—INSTRUCTIONS — WATCHMAN AT CROSSING.

Instruction submitting question of railroad's negligence in failing to maintain watchman at a crossing *held* properly refused because the question of contributory negligence was improperly injected into it.

3. TRIAL ⊕⇒261—REQUESTED INSTRUCTIONS—OBJECTION TO INSTRUCTIONS GIVEN.

Where improper instruction is objected to, it is the court's duty to submit a correct charge, though the charge tendered by the party objecting is objectionable.

4. RAILROADS ⊕⇒320—DUTY OF TRAINMEN AS TO PERSONS AT CROSSING.

Trainmen have a right to presume that person approaching track is in full possession of his senses, and will make proper use of them, and are not bound to anticipate that he will be negligent.

5. TRIAL ⊕⇒296(4, 5)—INSTRUCTION — DISCOVERED PERIL—CURE OF ERROR.

In action for injuries to jitney car passenger in collision with train, an instruction on discovered peril, erroneous in requiring trainmen to anticipate danger to deceased though it resulted from her negligence, was not cured by instruction requiring jury to find that deceased and other occupants of car were not conscious of the near approach of train.

6. TRIAL ⊕⇒253(4)—INSTRUCTION—IGNORING ISSUES.

In action for death of jitney car passenger in collision with train involving issues of negligence of railroad and contributory negligence

of deceased, instruction on damages *held* objectionable in eliminating issues of negligence and contributory negligence, and authorizing recovery on mere proof of damage sustained.

**7. NEGLIGENCE ☞93(1) — IMPUTED NEGLIGENCE—OCCUPANT OF AUTOMOBILE.**

Negligence of driver of a conveyance is not imputable to an occupant who has no control over, and gives no directions to, the driver.

**8. RAILROADS ☞327(12) — CROSSING ACCIDENTS—OCCUPANT OF JITNEY CAR — CONTRIBUTORY NEGLIGENCE.**

A passenger of crowded jitney car approaching railroad crossing must use ordinary care to avoid injury, though the driver's negligence is not imputable to him.

**9. RAILROADS ☞350(21) — CROSSING ACCIDENT—CONTRIBUTORY NEGLIGENCE — QUESTION FOR JURY.**

Passenger in overcrowded jitney car *held* not, as a matter of law, contributorily negligent in becoming a passenger in the car and remaining therein while approaching a crossing, submitting herself to care and custody of driver.

**10. TRIAL ☞253(9)—INSTRUCTION — IGNORING EVIDENCE.**

In action for death of jitney car passenger in collision with train at crossing, where there was evidence raising issue of railroad's negligence in failing to maintain watchman at crossing, requested charge, eliminating such issue, *held* properly refused.

**11. APPEAL AND ERROR ☞1056(1)—CROSSING ACCIDENT—ACTION FOR DAMAGES — EVIDENCE—ORDINANCE.**

In action for death of jitney car passenger at a crossing, exclusion from evidence of city ordinance for purpose of showing violation thereof by driver was not reversible error, since driver's negligence in violating ordinance was not imputable to deceased.

Appeal from District Court, Tarrant County; R. E. L. Roy, Judge.

Suit by J. H. Wentzel and wife against the Chicago, Rock Island & Gulf Railway Company. Judgment for plaintiffs, and defendant appeals. Reversed and remanded.

Lassiter & Harrison and R. M. Rowland, all of Ft. Worth, for appellant.

Baskin, Dodge, Eastus & Ammerman, of Ft. Worth, for appellees.

BUCK, J. Suit was filed in the district court of Tarrant county by J. H. Wentzel and wife against the appellant to recover damages on account of the death of their foster daughter, Mary Wentzel, who is alleged to have been killed by the negligence of the defendant. It was alleged that she was riding in a jitney automobile on her way to Ft. Worth from Riverside, one of the residence suburbs, and that a collision occurred between the jitney and a train of the defendant. Defendant pleaded a general denial, specially denied negligence, and averred that Mary Wentzel was guilty of contributory negligence. From a judgment in favor of the plaintiffs in the sum of $3,500 the defendant has appealed.

The evidence shows that on the morning of February 5, 1918, a Ford jitney car, plying between Ft. Worth and Riverside, was making a trip to the city. It had on board eleven people and was an ordinary five-passenger car. Inside the car and in the rear were Guy Nesbit, Mrs. Martin, Mrs. Slate, Mrs. Phares, Miss Clara Wood, and Miss Mary Wentzel Guy Nesbit was sitting on the door on the north side of the car, and the five ladies were on the rear seat, two sitting in the laps of the others. On the front seat were Henry Cawthorne, Dewey Nesbit, and the driver, Mr. Albritton. Myrle Shockley was partly in and partly out of the car in front on the south side of it, and Homer Lawson was standing on the running board toward the front on the north side. The curtains were up on the car, though there was more or less opportunity for the occupants to see through the cracks between the curtains and the top, and through the isinglass in the curtains.

The jitney approached the railroad track going west, and the Rock Island train which collided with it was backing, going south, and they came together at the Belknap street crossing. There is a slight up-grade as the street approaches the crossing from the east. There are two tracks at this point, and the up-grade continues practically to the east track, the ground being about level thereafter, and the accident happened on the west track. Photographs accompany the statement of facts, and from them it appears that a dirt road or street, along which the jitney came, was in plain view of the approaching train for a considerable distance from the crossing, and that travelers on the road could see the approach of the train for a considerable distance, and that there was a flagman on the back of the train as it approached the crossing, and that he sounded the whistle repeatedly before reaching the crossing. The train moved some 20 to 40 feet after the collision, the automobile being wrecked and pushed along the track in front of the trucks. Homer Lawson, witness for defendant, testified that he was on the running board of the jitney, and that he saw the train when the jitney was about 150 feet from the crossing, and at that time the train was about 100 yards north of the crossing. He testified in part as follows:

"After I first discovered the train the jitney kept on going. We went up the incline that goes up to the tracks, and when he got within about eight or ten feet of the tracks, why the train kept coming, and when it got within about forty feet of the crossing I jumped off the jitney and hollered, 'For Christ's sake, stop.' And the train came on down and smashed the

car. When the train got within about forty feet of the crossing I jumped off. The jitney didn't stop at that time along there before it got struck; it kept going right ahead. The jitney was about ten feet from the track when I jumped off. At the time I jumped off the train was about forty feet north of the crossing. I saw a man on that train. He was standing on the back platform of the train, which would be the end nearest to the Belknap street crossing. I discovered him there when I first saw the train, and he kept standing there all the time. I was looking at him when I jumped off. Right at that moment the man on the back platform saw the car was going across, and he began to throw up his hands and holler, 'Yea, yea, yea!' At that time this party was about forty feet from the crossing. I jumped off right at that time. I watched this man all the time from the time I first saw him until the train hit the jitney. During that time he was throwing up his hands, hollering, and tapping a little whistle once or twice. He tapped that little whistle about the time I jumped off, or a little after I jumped off. He tapped that whistle when the train was within about ten feet of the jitney. He tapped it twice. Before that time, after I had seen him about forty feet away, he was throwing up his hands and hollering."

He further testified that there were about 2,000 people living in Riverside, and another witness testified that the population of Riverside was about 5,000, and that the citizens from a large section of the northeast part of county used this and other crossings near by for the purpose of reaching the city; that at this particular time the other two crossings were out of repair or not in a condition to be used. Lawson further testified that the curtains on the north side of the car had holes in them, and that he could see the people inside by looking through the holes in the curtains, and that was the only way he could see them; that he had frequently ridden this car, and usually went to work about the same time as the deceased, who used the same car; that the train in question was a passenger train, and that this was its usual time to back over Belknap street, and that he knew it was due to pass there at about that hour every morning; and that Mary Wentzel had the same opportunity to observe it as he had. He further testified as follows:

"My attention was first attracted to that train by the sounding of the air whistle on the rear end of the train. When my attention was so attracted I looked in the direction of the train. I have marked on this picture, as requested by you, about the place where the jitney was at the time I first heard the sounding of the air whistle, and that place I have indicated is just after we got around this turn—where we turned from going south to going west. I would judge that we were about one hundred and fifty or one hundred seventy-five feet from the Belknap street crossing at the time I first learned of the approach of the train. At that time I imagine the back end of the train was right in about where the station house is down here (indicating). When I first saw the train was when I turned this corner

right here (indicating). I was here, and the rear of the train was there where I have indicated. This is about one hundred yards down from the Belknap street crossing.

"I did not notice whether the bell on the engine was ringing or not. I believe the bell was tolling every now and then—that is, the bell on the engine; it was ringing continually, but the pendulum was swinging slowly, is what I mean. I heard the bell then, and I could hear it all right. I would say that the bell could have been heard two hundred yards south of me at that time by a person of ordinary hearing. It continued to ring that way until after the accident happened, and it was ringing when my attention was first attracted to the train, and it kept on ringing.

"After I first heard this whistle blown by the man on the rear of the train, I moved forward on the running board of the jitney and looked at the people in the front seat of the jitney car. About the time we were nearing the tracks, or when we were about seventy-five or one hundred feet from the track, I stepped forward to the front, and looked through the windshield to see if the driver was watching, and he seemed to be watching all right, and I stepped back about middleways on the running board. The driver was looking forward the way the jitney was going when I looked in. The curtains on the car came clear up to the windshield on the north side of the car, and I went forward on the running board and put my head around the curtains and looked through the windshield and gave a side glance at the crowd in the jitney. I saw kind of the side of Albritton's face. I did not see the face and eyes of all the people in the front seat, but those of the driver. He was the only one that I noticed at that time. * * * When the jitney got up onto the first track there, it was about five or six feet from the main line where the accident happened. My purpose in going up there and looking at the driver of the jitney was to see if he was watching the road, and to see if he had noticed the train. I concluded that he had. I jumped off of the jitney when it was on the first track and within about seven or eight feet of the second track. I jumped off because I saw the car was not going to stop, but was going on. Before I jumped off, I thought the jitney was going to stop on the first track, and the moment that I realized that it was not going to stop on the first track I then jumped off and hollered for him to stop. At that time the rear end of the train was about forty feet from the crossing. About the time I jumped off I made an outcry. I told him, 'for Christ's sake, stop!' My purpose in making that outcry was to call his attention to the train and for him to stop and to warn the crowd in the jitney. A little after I jumped off I saw the man on the rear end of the train holler something and wave his hand. He was hollering, 'Hey, Hey, Hey!' He was waving his hands out like that (indicating). He hollered loud enough for me to hear it right there at the jitney."

One of the grounds of negligence alleged by plaintiffs was the failure to keep at this crossing a watchman. Plaintiffs alleged that on account of the heavy traffic, and on account of the number of tracks at this point, it was the duty of the defendant to keep and

maintain a watchman or flagman, and to exercise a very high degree of care in moving its trains over said street crossing lest persons using said crossing would be confused or mistaken regarding which particular railway track was being used, and thereby expose themselves to danger of collision with such engines and trains.

The court charged the jury, in effect, that if the location of the crossing and the conditions surrounding it, together with the extent and volume of travel and traffic across said crossing, rendered said crossing unusually dangerous and hazardous, then it became a question of fact for the jury to determine whether the company, in the exercise of ordinary care, should have stationed and maintained a watchman at said crossing; and further instructed the jury that if they should find from a preponderance of the evidence that the crossing was unusually dangerous and hazardous, and that a person of ordinary prudence, in the exercise of ordinary care, would have maintained a watchman at said crossing, and that defendant did not maintain a watchman at said place, that such failure would be negligence on the part of the defendant; and if they should find that defendant was guilty of such negligence, and that the same was the proximate cause of the death of Mary Wentzel, and that she was not guilty of contributory negligence, they should find for the plaintiffs.

The first assignment complains of the failure of the court to instruct the jury affirmatively that if the defendant railway company exercised ordinary care in deciding not to have a watchman or flagman at the railroad crossing in question, then said defendant was not guilty of negligence in failing to have such a watchman or flagman at said crossing at the time of the accident in question. And the second assignment complains of the failure of the court to give a special instruction affirmatively submitting that defense. We are of the opinion that an affirmative instruction on behalf of the defendant should have been given if properly invoked, but we are further of the opinion that the charge requested is perhaps not free from objection, as being unduly restrictive in placing undue emphasis by way of repetition on the defensive issue involved, and as improperly injecting into this instruction upon said issue, the issue of contributory negligence. The concluding sentence of the tendered instruction is as follows:

"And even if you should find that the defendant railway company was guilty of negligence in not having a watchman or flagman at said crossing, nevertheless any recovery in this cause on account of such negligence, if any, would be barred and prevented by contributory negligence on the part of Mary Wentzel, if you should find her guilty of contributory negligence under the instructions given you on that subject by the court."

The issue of discovered peril is prominent in this case. The facts show that the flagman or pilot on the rear of the coach of the train being backed towards the crossing was in full view of the approaching jitney, and was looking at it, as it came towards the track on which the train was moving. The evidence shows that said flagman continued to strike an alarm or ring a bell, but that he did not attempt to apply the brakes until the coach was within eight or ten feet of the jitney. The evidence further shows that by the use of air brakes, such as this train was equipped with, a train of this length, and moving at the speed it was, can be stopped within 15 feet.

[1] If said flagman saw the imminence of the danger of the collision, and realized that the automobile was not going to stop before reaching the track, and further realized that a collision would thereby occur unless the train was stopped, then it was his duty to exercise ordinary care to use every reasonable means in his power to prevent the collision.

[2] We are of the opinion that, in submitting the question of whether or not defendant was guilty of negligence in failing to maintain a watchman at the crossing, the question of contributory negligence should not have been injected. According to the charge tendered, if the jury should find that the defendant was guilty of negligence in failing to maintain a watchman at this crossing, and should further find that the deceased was also guilty of contributory negligence, and should further find that defendant's flagman or watchman on the coach failed to exercise due care to prevent the collision after he discovered the imminent peril in which the occupants of the jitney were placed, and that such failure was the proximate cause of the injury to and death of deceased, yet by such charge the jury would likely be led to believe that by reason of the contributory negligence of the deceased the plaintiffs would be barred from a recovery.

[3] But while we conclude that the charge tendered was not free from objection, yet the duty of the court to give a proper instruction was invoked by the defendant's objection to the charge given, as shown by the first assignment, and it was the duty of the court, under such circumstances, to submit a correct charge to the jury, although the charge tendered by the defendant was subject to objections. Olds Motor Works v. Churchill, 175 S. W. 785; Ry. Co. v. Browder, 144 S. W. 1042. Hence we sustain the first assignment.

The third and fourth assignments are directed to the fourth paragraph of the court's charge, which was upon the issue of discovered peril. The court instructed the jury that if at the time the jitney was approaching the crossing of the railroad company—

"In such close proximity to such main line track, on which the passenger train in question was moving, as to be in peril of injury, if any, from said train, if said automobile should run upon said track, and you should further find and believe from the evidence that the pilot in charge of said train, standing on the rear end thereof—that is, the end nearest to and approaching said crossing—at said time actually saw said automobile or jitney in which plaintiffs' daughter was riding, and actually saw the peril, if any, in which plaintiffs' said daughter and the other occupants of said automobile were in, if any, and actually realized that plaintiffs' daughter was then unconscious, if you find that she was unconscious of the near approach of said train, and you further find that he actually saw and knew of this in time to have stopped said train and have avoided and averted the threatened injury, if any, by the use of all the means reasonably at his command at said time, if any, * * * and you further find and believe that he failed so to do, and that by reason of such failure, if he did so fail, said train struck said automobile in which plaintiffs' daughter was riding in such a manner and way as to injure her, and as the result of which injury she died, * * * you are instructed to find for the plaintiffs."

In the criticism of this charge made by appellant it is urged that it indicates to the jury that the jitney would be in peril from the train "if it should run upon the track," and, if the flagman saw that such was the case, it was his duty immediately thereupon to stop the train. It is urged that the issue which should have been submitted to the jury was whether it was apparent to the flagman that the jitney was about to run upon the track, and was therefore in peril. If the flagman saw or realized that the jitney was about to run upon the track, he necessarily saw and realized the peril of the occupants of the jitney, and should have thereupon in the exercise of ordinary care, used his utmost efforts to stop the train in time to avoid the accident. S. A. & A. P. Ry. Co. v. McGill, 202 S. W. 338.

[4] But as was said by our Supreme Court in Ry. Co. v. O'Donnell, 99 Tex. 636, 92 S. W. 409:

"The enginemen * * * had the right to treat the plaintiff as a person in full possession of his senses, and, seeing him near the track, might presume that he would make proper use of his faculties, and would get far enough away from the track to insure his own safety. They were not required to anticipate that he would be guilty of an act of negligence, either by remaining in danger, if he was so, or by putting himself in danger."

See, also, Ry. Co. v. Horwitz, 188 S. W. 26; Ry. Co. v. Sullivan, 168 S. W. 473; Ry. Co. v. Harrison, 163 S. W. 332; Ry. Co. v. Shetter, 94 Tex. 196, 59 S. W. 533. In the last-cited case the Supreme Court, in an opinion by Justice Williams, on a certified question from this court, says:

"But it must be borne in mind that upon this issue [discovered peril] the question is, was it known to the brakeman before plaintiff went upon the track, not simply that he desired to cross it, but that he would do so where his act would be negligent and expose him to danger? In other words, the brakeman must have known that plaintiff was in danger because he was about to do a negligent and dangerous act. We think it well settled that one person is not bound to anticipate negligent conduct on the part of another, and therefore that a jury would not be justified in finding that the brakeman, before he saw plaintiff actually in danger, knew that he was negligently going into danger. That the knowledge of the brakeman must have been such as we have defined is true, because the rule under discussion applies only where the plaintiff has been guilty of negligence, and therefore only charges defendant with liability, if, after discovery of the danger to which such negligence has exposed the plaintiff, it fails to exercise due diligence to avoid injury. It does not impose any liability because of mere failure to exercise care to discover the peril. Railway Co. v. Breadow, 90 Tex. 27, 36 S. W. 410; Railway Co. v. Staggs, 90 Tex. 458, 39 S. W. 295. A person walking negligently along a railroad track in front of a moving train will surely be hurt unless the train stops or he gets out of its way. In a sense he may be said to be in danger, but those controlling the train are not required to assume that, by his negligent failure to act, he will remain in danger. It is only when they have realized that he cannot or will not get out of the way that the duty of averting a collision arises. Certainly it is at least equally true that trainmen are not bound to assume that a person not on the track will get on it, where it would be negligent and dangerous for him to do so; and, as they would not be bound to assume it, a jury could not properly find that they knew it would be done, in the absence * * * of knowledge."

[5] It is true in the charge given by the court the jury were instructed that before they could find for plaintiffs they must find, in addition to other facts, that the deceased and other occupants of the automobile were unconscious of the near approach of the train. But we hardly think this feature of the charge removes the force of the defendant's objection. Not only would the jury be required to find that the occupants of the car approaching the train were unconscious of the proximity of the train at some stage before the car reached the crossing, but that they would likely remain unconscious of the approaching train until they had reached the crossing and were placed in a position of peril. Upon another trial the charge upon this issue should be so worded as to submit the element of knowledge on the part of the flagman hereinabove pointed out. The objection under discussion is presented from a different angle in assignments 3, 4, 5, and 6, and we believe that these assignments present reversible error.

We overrule the seventh assignment because we are of the opinion that the facts in evidence raise the issue of negligence and lia-

bility on the part of the defendant for failing to have a watchman or flagman at the crossing at the time of the accident in question. In the eighth paragraph the court instructed the jury in part as follows:

"If you find and believe from the evidence that the plaintiffs herein have been damaged, if any, by reason of the death of their said daughter, Mary Wentzel, then you will allow the plaintiffs such sum of money, if any, if paid now, as you may find that the said Mary Wentzel would have, with reasonable probability, contributed to the plaintiffs, if she had lived," etc.

There is no limitation in this paragraph on plaintiffs' right to recovery, except that the jury must find that the plaintiffs have been damaged, and that their deceased daughter would have contributed out of her earnings to their support. There is no reference to any other portion of the charge contained in this paragraph. Under the eighth assignment complaint is made of this paragraph on the ground that it practically eliminates the issues of negligence and contributory negligence, and practically amounts to a peremptory instruction in favor of the plaintiffs in the event the jury should find from the evidence that the plaintiffs were damaged by reason of the death of their daughter.

[6] We are of the opinion that the criticism is well founded. If this paragraph of the charge had instructed the jury that in the event they should find for plaintiffs under other instructions given, and further instructed the jury upon the measure of damages as contained in the paragraph in question, the objectionable feature of the charge would have been obviated.

Under the tenth and eleventh assignments it is urged that in the ninth paragraph of the court's charge the jury was erroneously instructed that although the jury might find that the driver of the jitney was guilty of negligence in driving said jitney upon defendant's track at the time and place he did, yet they could not attribute the negligence of the driver to the deceased.

[7] The rule is that one riding in a conveyance driven or operated by another, he having no control over and giving no directions to the driver, will not, in an action for damages by reason of a collision, have the contributory negligence of the driver imputed to him. But this does not relieve such person from the duty of using ordinary care to avoid the injury.

[8] If a person of ordinary care would not have become a passenger in a car, loaded and in the condition as the one in question is shown to have been from the evidence, or would not have remained in said car while approaching the railroad crossing under the circumstances shown, or would have discovered the approach of the train with which the car collided, then such want of care would be imputable to the deceased as con-

tributory negligence but the negligence of the driver of the car is not of itself imputable to a passenger. G., H. & S. A. Ry. Co. v. Faber, 77 Tex. 153, 8 S. W. 64; C. T. & N. W. Ry. Co. v. Gibson, 83 S. W. 862; El Paso Electric Ry. Co. v. Benjamin, 202 S. W. 996.

[9] We are of the opinion that the facts fail to show that as a matter of law the deceased was guilty of contributory negligence by submitting herself to the care and custody of the driver of the car, but it is probably a question for the jury, and, if upon another trial such instruction is requested, it ought to be given.

[10] We are of the opinion that the requested charge set out in the fourteenth assignment was properly refused, because it eliminates the issue of negligence on the part of the defendant in failing to keep and maintain a watchman at this crossing.

The fifteenth assignment complains of the refusal of the court to admit in evidence the ordinance of the city of Ft. Worth regulating and controlling the operation of jitney cars within the limits of said city. Certainly the ordinance as a whole was not pertinent or relevant to any issue or issues involved in this case, and therefore no error is shown in its exclusion. The sixteenth assignment, however, alleged error to the exclusion of each and every separate portion of the said jitney ordinance offered in evidence. Said assignment, in part, is as follows:

"The court erred separately in each instance in his ruling excluding and refusing to admit in evidence each portion of said jitney ordinance that was separately offered in evidence."

In the statement under these two assignments it is urged that error is shown particularly in the exclusion of that portion of said ordinance which reads as follows:

"It shall be unlawful to drive or operate any motor bus while any person is standing or sitting upon any running board or fender thereof, or while any person is riding on such motor bus outside the body thereof; it shall also be unlawful for any person to stand or sit upon any fender or running board of any motor bus, or occupy any portion of such motor bus outside the body thereof, while such motor bus is in operation; or for more than one passenger to ride in the front seat."

It is not contended, nor does the evidence show, that Mary Wentzel was violating any provision of this ordinance. The most that can be said is that the driver was disregarding the terms of the ordinance, and that certain of his passengers were violating the portion of the ordinance above quoted. The contributory negligence of the driver or of other passengers would not be imputable to the deceased. In addition to authorities cited hereinabove, see 29 Cyc. pp. 547, 548, and 549. The fact that the driver might have been guilty of negligence per se in violating the terms of an ordinance would not make the

deceased guilty of negligence per se by reason of the driver's acts. But at last it would be a question whether or not she, under all the facts and circumstances, was guilty of contributory negligence in becoming a passenger in the car, and in submitting herself to the care and custody of the driver, under the circumstances and surroundings disclosed by the evidence. The facts as to such conditions and surroundings were before the jury, and we cannot see that evidence which might tend to show that the driver was guilty of negligence per se because he had disregarded one or more provisions of the ordinance mentioned could properly shed any light upon the issue of whether or not Mary Wentzel was guilty of contributory negligence.

[11] At least, we are not prepared to say that reversible error was committed in the exclusion of said ordinance or any portion of it, although the question presented is not free from difficulty, but we are inclined to the opinion that the assignment should be overruled.

We do not find it necessary to discuss other assignments specifically, because we believe that all of the questions here presented likely to arise on another trial have been disposed of by what we have already said. The judgment of the trial court is reversed and the cause remanded.